# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

AMY M. JORDAN,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-120

Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

    Plaintiff Amy M. Jordan brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

(Commissioner) denying her application for supplemental security income ("SSI"). This matter

is before the Court on plaintiff's statement of errors (Doc. 15), the Commissioner's response in

opposition (Doc. 20), and plaintiff's reply memorandum (Doc. 23).

## I. Procedural Background

    Plaintiff protectively filed her application for SSI in June 2014, alleging disability since

January 15, 2003, due to bipolar disorder, depression, anxiety, asthma, osteoarthritis,

hypothyroidism, heart palpitations, and being overweight.[1] The application was denied initially

and upon reconsideration. Plaintiff, through counsel, requested and was afforded a hearing

before administrative law judge ("ALJ") Peter Jamison on January 17, 2017. Plaintiff and a

vocational expert ("VE") appeared and testified at the ALJ hearing. On March 15, 2017, the

ALJ issued a decision denying plaintiff's application. Plaintiff's request for review by the

---

[1] Plaintiff previous filed applications for SSI and disability insurance benefits ("DIB") in January 2011. Plaintiff's applications were denied by ALJ John M. Prince on January 14, 2013 and by the Appeals Council on March 27, 2014. (Tr. 102-23, 124-27).

Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for SSI, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

416.920(a)(4)(i)-(v), 416.920 (b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

ALJ Jamison applied the sequential evaluation process and made the following findings

of fact and conclusions of law:

> 1. The [plaintiff] has not engaged in substantial gainful activity since June 5, 2014,
> the application date (20 CFR 416.971, *et seq*).
>
> 2. The [plaintiff] has the following severe impairments: lumbar and cervical spine
> disorders, degenerative joint disorder of the bilateral hips, knees, shoulders, and
> right ankle, obesity, asthma, migraine headaches, anxiety and affective disorders
> and substance abuse (20 CFR 416.920(c)).
>
> 3. The [plaintiff] does not have an impairment or combination of impairments that
> meets or medically equals the severity of one of the listed impairments in 20 CFR
> Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, [the ALJ] finds that the
> [plaintiff] has the residual functional capacity to perform light work as defined in
> 20 CFR 416.967(b) except she is further limited to lifting or carrying 20 pounds
> occasionally and 10 pounds frequently; sitting for 6 hours in an 8-hour workday;
> standing and/or walking 6 hours in an 8-hour workday; pushing or pulling within
> the lifting restrictions; operating foot or hand controls occasionally; occasionally
> reaching overhead; frequently handling, fingering, feeling, or reaching in all other
> directions; occasionally stooping, kneeling, crouching, or crawling; never working
> at unprotected heights, around moving mechanical parts, or operating a motor

vehicle; avoiding all exposure to humidity or wetness; avoiding concentrated exposure to dusts, odors, fumes and pulmonary irritants; avoiding all exposure to temperature extremes or vibration; performing simple, routine, and repetitive tasks but not at a production rate pace (*e.g.* assembly line work); making simple work-related decisions; occasional interaction with supervisors; occasionally interacting with coworkers on a superficial basis; never interacting with the general public; and tolerating no more than ordinary and routine changes in work setting and duties.

5. The [plaintiff] is unable to perform past relevant work (20 CFR 416.965).[2]

6. The [plaintiff] was born [in] . . . 1970 and was 43 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 416.969 and 416.969(a)).[3]

10. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since June 5, 2014, the date the application was filed (20 CFR 416.920(g)).

(Tr. 22-31).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

---

[2] Plaintiff has past relevant work as a fast food worker and housekeeper, both light, unskilled positions; a delivery driver, a medium skilled position; and a stock clerk, a heavy, semi-skilled position. (Tr. 30, 93).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of light, unskilled occupations such as assembler/small product (675,000 jobs nationally); inspector (269,000 jobs nationally); and packer (189,000 jobs nationally). (Tr. 31, 95).

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Medical Evidence**

**1. Physical evidence**

On November 13, 2014, plaintiff visited Dr. Michael Danko, M.D., at Comprehensive Pain Specialists for consultation, evaluation, and treatment of her "generalized pain." Plaintiff

reported that her pain first began over ten years ago and that the cause was unknown. Plaintiff rated her pain severity at a level of "6" on a 0-10 visual analog scale. (Tr. 451). She noted that her pain level improves by sitting, lying on her side, and standing, and with heat application, but worsens by sitting, changing from sitting to standing, bending or stooping, walking, using her arms, and lifting or carrying small and heavy loads. (*Id.*). Dr. Danko noted that plaintiff's pain treatment history included x-rays and lab work, treatment with a chiropractor, and several medication trials. On examination, Dr. Danko found a normal range of motion of her cervical spine with normal lordosis, no myofascial trigger points, and minimal cervical facet tenderness. Examination of the lumbar spine showed normal lordosis or tenderness, a normal range of motion, and negative straight leg raising. Plaintiff was found to be 5 feet, 7 inches tall and weighed 219 pounds. Her BMI was 34.30. (Tr. 453). Dr. Danko prescribed gabapentin, a pain medication. (Tr. 454). During a follow-up appointment with Dr. Danko in December 2014, plaintiff reported that the "current regimen [was] providing relief of pain." (Tr. 549). Plaintiff noted an improved function and quality of life. (*Id.*). The frequency of plaintiff's pain was reported to be fluctuating but always present. Plaintiff described her pain as aching, throbbing, burning, and radiating into her neck and down into her lower back. (*Id.*). Dr. Danko assessed cervicalgia, low back pain, myofascial pain syndrome, cervical spondylosis, long term use of opiate analgesic, and depression. (Tr. 551). Dr. Danko started plaintiff on Norco medication and discussed smoking cessation and BMI management with her. (*Id.*).

On March 29, 2015, plaintiff went to the emergency room at Mercy Hospital Anderson complaining of abdominal and back pain. (Tr. 574). On examination, plaintiff had a normal range of motion in all of her extremities with normal coordination. She exhibited no tenderness

6

on her back and had a normal mood and affect. (Tr. 578). Plaintiff was given prescriptions for Flomax and pain medication, and she was discharged in good condition. (Tr. 580).

In March 2016, plaintiff visited the emergency room with a hoarse voice and dysphagia. (Tr. 560). Plaintiff's overall examination was normal, but the emergency room doctor was concerned that she had a laryngeal mass given her symptoms and history of smoking. (*Id.*). Plaintiff had a normal gait and full strength and equal movement in all of her extremities. (Tr. 559).

In September 2015, plaintiff had a consultation with rheumatologist, Dr. Robert E. Hiltz, M.D., for an evaluation of her diffuse joint/muscle pain. She reported having symptoms for years, mostly back pain, and not having adequately responded to previous interventions, including over-the-counter NSAID's, gabapentin, and SSRIs. (Tr. 982). Dr. Hiltz noted that plaintiff's overall condition is "complicated by multiple comorbidities, mainly heavy smoking, chronic bronchitis, depression, and hypothryoid [sic]." (*Id.*). Dr. Hiltz questioned whether plaintiff had inflammatory arthritis or fibromyalgia. (*Id.*). Plaintiff was 5 feet, 7 inches tall and weighed 223 pounds with a BMI of 35.01. (Tr. 984). Plaintiff reported that she was positive for malaise/fatigue; blurred vision; cough, sputum production, shortness of breath and wheezing; chest pain, palpitations, and leg swelling; heartburn and nausea; urgency; myalgias, back pain, joint pain, and neck pain; and depression and nervousness/anxiousness. (*Id.*). On physical examination, plaintiff had a normal range of motion of the neck and a normal heart rate. (Tr. 985). Plaintiff exhibited tenderness in the musculoskeletal region, but she exhibited no edema, nodules, synovitis, tophi, or effusions. (*Id.*). Plaintiff also displayed normal reflexes, muscle tone, and coordination. (*Id.*). Dr. Hiltz assessed generalized pain, mainly because of plaintiff's

7

multiple chronic illnesses such as lung disease, depression, and obesity. (*Id.*). Dr. Hiltz stated to plaintiff:

> "Your lungs sound terrible; It's time to quit smoking: When a major organ system like your lungs is not working very well, then nothing will feel good. Work on a very low impact exercise program, such as walking and stretching to start with. Try cutting back on carbs and sugars, no artificial sweeteners and work on getting some weight off. We'll check the labs to make sure there is not an Inflammatory arthritis process going on (the mildly elevated [C-Reactive Protein] in the past could be related to the smoking as well)."

(Tr. 986). On September 24, 2015, an MRI of the lumbar spine showed no central or foraminal stenosis and no herniations, and mild spondylosis at L3-4 and L4-5. (Tr. 989-90).

In May 2016, plaintiff first visited Matthew Ebacher, CNP, at Advanced Spine & Pain Management for her chronic low back pain. (Tr. 544-47). Plaintiff reported that her chronic low back pain began in 2007 due to degenerative disc disease. She described the pain as constant, stabbing, sharp, throbbing, and achy. Plaintiff rated her pain severity as a "5" on a 0-10 scale. Mr. Ebacher found that radicular pain was present in the bilateral hips and down to her toes. Plaintiff also complained of pain in her neck with radiation to both arms. She experienced multiple joint pain due to osteoarthritis. This pain occurred with minimal exertion and was relieved with rest and medication. (Tr. 544). On examination, Mr. Ebacher found plaintiff's shoulder range of motion was abnormal bilaterally, her knee was tender upon palpation, she had a decreased range of motion in the knees, and the range of motion in her hip joints was limited with crepitus. Plaintiff also had a decreased range of motion in the lumbar spine and increased paravertebral muscular tension. (Tr. 545-46). Her weight was 218 pounds. (Tr. 545). The record shows plaintiff continued to treat with Mr. Ebacher through at least November 2016 for pain management services. (Tr. 946-65).

8

Plaintiff was referred to physical therapy by Mr. Ebacher. She received physical therapy for her lumbar spine at the Center for Physical Therapy from September 28, 2016 to December 29, 2016. (Tr. 889-97). Plaintiff's physical therapist, Karen Scholl, PT, completed a medical source statement on December 29, 2016, in which she opined that plaintiff was limited to occasionally lifting or carrying less than 10 pounds, standing or walking less than 2 hours in an 8-hour workday, sitting about 6 hours in an 8-hour workday, and alternating positions periodically. Ms. Scholl indicated that plaintiff had significant pushing and pulling limitations; she could never kneel, crawl, or climb; she could only occasionally balance or crouch; and her ability to reach in all directions, handle, or finger was limited. (Tr. 899-903). Ms. Scholl supported her conclusion with a functional capacity evaluation she performed that same day, as well as ongoing physical therapy findings. (Tr. 887-88). During her evaluation, plaintiff could only lift five pounds from the floor to her waist. (Tr. 888).

On August 28, 2014, Dr. Susan Stegman, M.D., conducted a consultative physical examination of plaintiff at the request of the state agency. (Tr. 429-36). During the evaluation, plaintiff reported her chief complaint to be pain in her neck, hips, back, and hand, as well as shortness of breath. (Tr. 433). Plaintiff reported that her pain first began in 2007, but had progressed despite obtaining short-term narcotics and treatment with multiple providers over the last several years. (*Id.*). Plaintiff also reported having problems with diffuse muscle cramps and pain. (Tr. 434). Dr. Stegman noted that plaintiff had a 52-pack per year history of smoking and continues to smoke. (*Id.*). On physical examination, Dr. Stegman found that plaintiff weighed 215 pounds, she had normal posture and gait, and was capable of getting on and off the examination table. Plaintiff had a normal range of motion with no restriction of the neck, hips,

9

or hands, and no evidence of erythema, swelling, or synovitis at any joint. (Tr. 435). Her neurological findings were also normal. (Tr. 429-33, 435-36). Dr. Stegman opined that plaintiff was capable of either sedentary or light work, but she could lift in the medium range. Dr. Stegman also opined that plaintiff "appears to have major limitations in her ability to perform physical duties over an eight-hour day." (Tr. 436).

In October 2014, after reviewing plaintiff's file on initial consideration, state agency physician, Robert Wysokinski, M.D., found that plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. Dr. Wysokinski also opined that she should avoid concentrated exposure to pulmonary irritants such as gases, dusts, and poorly ventilated areas and avoid concentrated exposure to extreme cold, extreme heat, and humidity. (Tr. 137-38). In February 2015, Lynne Torello, M.D., reviewed plaintiff's file for reconsideration purposes and affirmed Dr. Wysokinski's assessment. (Tr. 153-54).

### 2. Mental Health Evidence

Psychiatrist Dr. Kode Murthy, M.D., treated plaintiff from April 2015 through December 2016. (Tr. 522-35, 873-76). Dr. Murthy's treatment notes show that he treated plaintiff with Prozac, Wellbutrin, and Cymbalta under the diagnosis of major depression. (*Id.*).

In January 2017, Dr. Murthy completed a mental impairment questionnaire in which he opined that plaintiff was markedly limited in her ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest period; her ability to understand, remember and carry out detailed, but not complex, job instructions; her ability to perform

10

activities within a schedule; her ability to maintain regular attendance and be punctual with customary tolerance; her ability to function independently without the assistance and guidance of another; her ability to maintain social functioning, including the ability to get along with family, friends, neighbors, etc.; and her ability to maintain concentration, persistence or pace, so as to complete tasks in a timely manner in work or work-like settings. (Tr. 906-07). Dr. Murthy opined that plaintiff had extreme limitations in her ability to perform daily activities, such as independently and effectively cleaning, shopping, cooking, using public-transportation, paying bills, maintaining a residence, and caring for grooming and hygiene and her ability to deal with, on a sustained basis, the stress of getting to work regularly, having performance supervised, and remaining in the work place for a full day. (Tr. 907). Dr. Murthy indicated that plaintiff's impairment lasted or could be expected to last at least twelve months and that plaintiff did not deny or minimize the existence of her impairment. (Tr. 906). Dr. Murthy noted that plaintiff had been under his care since April 2015 but achieved no substantial improvement so far. (Tr. 908).

Plaintiff had an initial consultation with Mr. William Box, MDiv, MS, LPCC, of Greater Cincinnati Behavioral Health in February 2015. (Tr. 861-70). Mr. Box noted that plaintiff's mood was down/depressed, and she was tearful with a constricted affect. (Tr. 862). Plaintiff reported increased irritability, excessive sleep, poor activities of daily living, poor concentration and memory, shortness of breath, tightness/ache in chest, pacing, sweating, and feeling as if something dreadful is going to happen. (Tr. 863). Plaintiff reported avoiding contact with others and feelings of hopelessness and helplessness. (*Id.*). Mr. Box initially diagnosed plaintiff with major depressive disorder and panic without agoraphobia and assigned a Global Assessment of

Functioning ("GAF") score of 60. (Tr. 870).[4] Plaintiff began therapy with Mr. Box the following month. (Tr. 810-60).

In March 2015, plaintiff complained of pain resulting from a recent move, as well as low energy, poor sleep, increased frustration, and feelings of hopelessness. (Tr. 852). On April 21, 2015, plaintiff reported that she continued to experience pain and panic episodes. (Tr. 850). On April 28, 2015, plaintiff reported that she was preparing to travel with her extended family to Kentucky. Her session with Mr. Box focused on her low self-worth, lack of purpose and meaning in her life, frustration related to her limitations, and feelings of being out of control of her life. (Tr. 849). Mr. Box discussed with plaintiff the importance of increasing self-care and setting limits. (*Id.*). Plaintiff reported that her Prozac was helping and she was less irritable. (*Id.*). In May 2015, plaintiff reported she had "an extremely good visit" with her family in Kentucky. She also expressed frustration with her pain doctor as she continued to experience muscle pain, joint stiffness, and gelling (stiffness after rest) symptoms. (Tr. 848). In June 2015, plaintiff continued to express frustration and anger at the difficulty she was having with getting medical treatment for her chronic pain. (Tr. 845). Mr. Box gave plaintiff the goals of increasing coping skills related to depression/anxiety and anger outbursts. (*Id.*). In July 2015, Mr. Box and plaintiff discussed frustration related to her physical pain and not trusting others, especially men.

---

[4] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death)." *Id.* at 34. A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006).

(Tr. 841). Plaintiff cancelled her next two appointments and was advised her case would be closed if she did not reschedule. (Tr. 838). At her next appointment in August 2015, plaintiff reported she went to a demonstration in South Carolina in August 2015. She reported feeling very good about going out on her own; however, she was in considerable pain and stayed in bed for a week after she returned home. (Tr. 837).

In September 2015, plaintiff reported to Mr. Box that she went to a party and then to a bar with a friend. She reported that she did not have a clear memory from that night and awoke the next day with bruises. Mr. Box told plaintiff that she needs to focus on her well-being, reduce her alcohol use, and avoid situations that are not healthy for her. (Tr. 836). Plaintiff reported that she was under the care of a pain management doctor, referred to a rheumatologist, prescribed a TENS unit, and started physical therapy, all of which made her mood less stressed and anxious. (Tr. 835). Plaintiff reported low energy and motivation to complete household chores and tasks. (Tr. 834). She indicated that she will often start a task and have difficulty completing it. (Id.). In November 2015, plaintiff reported that her pain was down to a tolerable level, but if she is too active, her pain escalates. (Tr. 831). Plaintiff reported that her anger outbursts had improved and she had a better ability to control her anger. (Id.). Her mood remained down/depressed, but was not as severe as in the past. (Id.).

In December 2015, plaintiff complained of increasing irritability and anger with thoughts of wanting to lash out. She reported her psychiatrist increased her medication which she felt was helping. She agreed to use positive self-talk and remind herself that she has control over her feelings. (Tr. 828). In January 2016, plaintiff's session with Mr. Box focused on her relationship with her son and how she tends to become angry when others disagree or dispute

13

what she says. (Tr. 825). Mr. Box continued plaintiff with the goal of increasing coping skills related to her depression, anxiety, and anger outbursts. (*Id.*). In March 2016, plaintiff reported feeling more anxious, mild-to-moderately restless and irritable, having difficulty focusing, and having poor memory. (Tr. 821). Plaintiff reported feeling unsettled and experiencing congestion and difficulty swallowing. (*Id.*). Mr. Box discussed with plaintiff the importance of focusing on her well-being, taking time in the mornings to be outside, reducing her stress, and talking with her doctor about her medications. (*Id.*). Plaintiff also reported that her relationship with her boyfriend was going well. (Tr. 820). In May 2016, plaintiff and Mr. Box discussed not dwelling on what is beyond plaintiff's control and ways to vent using relaxation activities and talking with her boyfriend. (Tr. 814). In August 2016, plaintiff presented with down/depressed mood, tearfulness, moderate hopelessness, frustration, and a negative self-image. She discussed various life stressors. (Tr. 810). Plaintiff and Mr. Box discussed focusing on each day, using self-talk to dispute irrational beliefs, and recognizing what plaintiff can truly control and what is beyond her control. (*Id.*).

On January 10, 2017, Mr. Box completed a mental health questionnaire. (Tr. 921-24). Mr. Box listed plaintiff's diagnosis as major depression, recurrent, moderate and severe, and panic without agoraphobia. (Tr. 921). Mr. Box indicated that plaintiff had marked or extreme limitations in all categories of work-related functioning, including extreme limitations in her daily activities such as paying bills. (Tr. 922-23). Mr. Box opined that plaintiff had a less than moderate limitation in her ability to be aware of normal hazards and take appropriate precautions. (Tr. 923). According to Mr. Box, if plaintiff overextends herself in attempts to

14

accomplish daily activities, she will require one to three days to recover. (Tr. 922). Mr. Box explained the clinical findings supporting his assessment as follows:

> Amy has consistently been impaired by her conditions since 2/25/2015. Amy experiences on a daily basis most, if not all, of the following: down/depressed mood, constant worry/anxiety, withdrawing/isolation, low motivation, low energy, irritability, anger outbursts, low self worth, hopelessness, fatigue, poor concentration, poor memory and tremers [sic]; Amy also experiences chronic pain which exacerbates her symptoms.

(Tr. 924).

Dr. Richard Sexton, Ph.D., conducted a consultative psychological examination at the request of the state agency in August 2014. (Tr. 420-27). Plaintiff reported that she was "depressed, anxious, moody, and frustrated." (Tr. 425). As to her activities of daily living, plaintiff responded that she dresses herself, performs household chores, watches television, listens to the radio, and visits with friends. (Tr. 422). On mental status examination, her facial expression suggested depression. She was cooperative and motivated; her responses were goal-oriented; associations were well-organized; and she was tearful at times. Her affect was appropriate. She exhibited no psychomotor activity. She reported anxiety. (Tr. 423). Dr. Sexton found slight impairment in attention. Her insight/judgment was intact. Dr. Sexton estimated that plaintiff's level of intelligence fell in the low average range. (Tr. 424). Dr. Sexton noted that plaintiff had never required a "high level of mental health care." He assessed depressive and anxiety disorder, and assigned a GAF score of 66. (Tr. 425-26). He opined that plaintiff could understand and apply instructions in a work setting consistent with low/average intellectual functioning; had no limitations in her ability to conform to social expectations in a

work setting; and would be expected to respond appropriately to workplace pressures. (Tr. 426-27).

In December 2014, Dr. Steven Halmi, Psy.D., conducted a psychological evaluation at plaintiff's request "to provide a psychological diagnosis and make treatment recommendations." (Tr. 510-19). On mental status examination, plaintiff was neatly and casually dressed. She diverted eye contact and was restless and fidgety. She did not manifest any excessive pain behavior or exaggerated signs of psychopathology. Her speech was articulate. Plaintiff's affect was generally depressed, and she cried several times during the interview. She endorsed several symptoms commonly associated with anxiety including worrying excessively and having difficulty controlling her worry. (Tr. 516). Dr. Halmi found that plaintiff "presents with a very complicated psychological profile. She is reporting symptoms consistent with depression, anxiety, and a personality disorder. She also has a history of substance abuse. These psychological conditions have many symptoms that overlap." (Tr. 518). Dr. Halmi diagnosed plaintiff with persistent depressive disorder, major depressive disorder, unspecified anxiety disorder, and borderline personality disorder. (Tr. 518). Dr. Halmi recommended that plaintiff participate in individual psychotherapy. (Tr. 519).

In October 2014, state agency psychologist, Deryck Richardson, Ph.D., reviewed plaintiff's psychological medical record. Dr. Richardson's RFC restricted plaintiff to simple, routine, and repetitive one-to-three step tasks with no close teamwork; no more than occasional and superficial contact with coworkers; no more than occasional contact with supervisors in a non-production paced work environment that does not involve customer or public relations; and only intermittent and superficial contact with the public in a job setting with generally only

routine and ordinary changes. (Tr. 135-38). State agency psychologist, Leslie Rudy, Ph.D., reviewed plaintiff's file upon reconsideration and affirmed Dr. Richardson's assessment. (Tr. 150-51, 154).

### E. Specific Errors

In her statement of errors, plaintiff argues that: 1) the ALJ failed to accord the plaintiff's treating sources, Dr. Murthy and Mr. Box, appropriate weight; 2) the ALJ's credibility finding is not supported by substantial evidence; 3) the ALJ failed to comply with SSR 02-01p in considering the impact of plaintiff's obesity on her ability to work; 4) the ALJ failed to properly evaluate plaintiff's RFC; and 5) the ALJ failed to properly consider the medical source statement completed by plaintiff's physical therapist, Ms. Scholl, pursuant to Social Security Ruling 06-03p. (Doc. 15).

### 1. Substantial evidence supports the weight given to the opinions of plaintiff's treating psychiatrist and treating counselor.

Plaintiff alleges as her first assignment of error that the ALJ erred by failing to properly weigh the medical opinion evidence of record, including the opinions of her treating psychiatrist, Dr. Murthy, and her treating counselor, Mr. Box.[5] (Doc. 15 at 9-12). Plaintiff alleges that the therapy notes submitted by Mr. Box of Greater Cincinnati Behavioral Health support the opinion rendered by Dr. Murthy. (*Id.* at 11). Plaintiff argues that the psychological evaluation completed by Dr. Halmi is also consistent with the opinions of Dr. Murthy and Mr. Box. (*Id.*). Plaintiff alleges that the ALJ erred in affording greater weight to the state agency reviewing

---

[5] Both plaintiff and the Commissioner refer to Mr. Box as a psychiatrist. However, the record makes clear that Mr. Box is a licensed professional clinical counselor. (Tr. 861-70).

psychologists who rendered their opinions prior to the records submitted by Dr. Murthy, Dr. Halmi, and Mr. Box. (*Id.* at 12).

In response, the Commissioner contends that the ALJ gave good reasons for affording Dr. Murthy's opinion little weight because his opinion was inconsistent with his treatment notes. (Doc. 20 at 6). The Commissioner argues that Dr. Murthy never identified extreme or marked behaviors in his treatment notes. (*Id.*). The Commissioner argues that Dr. Murthy's treatment notes only show that he treated plaintiff with medication and does not show that plaintiff required any aggressive treatment such as hospitalization or inpatient care. (*Id.*). The Commissioner contends that an ALJ may reasonably discount a treating physician's opinion when the record only documents conservative care. (*Id.* at 7) (citing *Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678 (6th Cir. 2013)). The Commissioner argues that the ALJ also considered the inconsistencies between Dr. Murthy's opinion and plaintiff's daily activities. (*Id.*). The Commissioner also argues that the ALJ appropriately considered that Mr. Box's opinion was inconsistent with his own treatment notes, including plaintiff's GAF score of 60 indicating moderate limitations. (*Id.*). The Commissioner also contends that the ALJ thoroughly considered facts that would weigh in favor of plaintiff's claim for benefits. (*Id.* at 8).

In reply, plaintiff alleges that the ALJ erred in relying on her GAF score to undermine the opinions of Dr. Murthy and Mr. Box. (Doc. 23 at 3-4). Plaintiff maintains that the ALJ erred in affording the opinions of the state agency reviewing psychologists significant weight because they did not review her psychological medical records. (*Id.* at 4).

The ALJ afforded the opinions of Dr. Murthy and Mr. Box little weight. (Tr. 29). The ALJ noted that Dr. Murthy's "treatment consisted primarily of medication management, and

[Mr.] Box offered a GAF of 60, with no subsequent discussion of a significantly worsening condition, and certainly no findings that would reduce[ ] the [plaintiff] to a marked or extreme functionality." (*Id.*). The ALJ noted that Dr. Murthy and Mr. Box's conclusions that plaintiff could manage her benefits were contradicted by their checkbox answers. (*Id.*). The ALJ found that the opinions of state agency psychologists Dr. Richardson and Dr. Rudy were generally supported by the record and fully accommodated by the RFC. (*Id.*). However, the ALJ found that plaintiff was further limited in her ability to deal with the public and should have no such interaction. (*Id.*).

The Commissioner's regulations establish a hierarchy of acceptable medical source opinions. *Snell v. Comm'r of Soc. Sec.*, 3:12-cv-119, 2013 WL 372032, at *9 (S.D. Ohio Jan. 30, 2013); 20 C.F.R. § 416.927. It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §416.927(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937. This procedural requirement "ensures that the ALJ applies the treating physician rule and permits

20

meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

The ALJ gave "good reasons" for discounting the opinion of Dr. Murthy and those reasons are supported by substantial evidence. The ALJ reasonably noted that although Dr. Murthy treated plaintiff since April 2015, his treatment consisted of primarily medication management and his treatment records do not reflect the extreme or marked behaviors he identified in his medical opinion. The ALJ noted that Dr. Murthy's opinion was also inconsistent with the treatment notes of Mr. Box, plaintiff's clinical counselor, who assigned plaintiff a GAF score of 60, indicating only moderate symptoms.

The ALJ also reasonably determined that Dr. Murthy's opinion that plaintiff had an extreme limitation (defined as "no useful ability to function in this area") in her ability to perform daily activities such as cleaning, shopping, cooking, using public transportation, paying bills, maintaining a residence, and caring for herself was inconsistent with the record that showed plaintiff lived alone and managed her household and personal finances. The ALJ aptly noted that this opinion also contradicted Dr. Murthy's own conclusion that plaintiff could manage her own benefits. (Tr. 29). The ALJ cited to many inconsistencies in the record and reasonably concluded that the objective evidence supported a finding of mild to moderate limitations, which is consistent with the limitations incorporated in his RFC determination. (Tr. 28).

The ALJ also properly determined that Dr. Murthy did not cite objective evidence to support several of his findings on a "checkbox form" Dr. Murthy completed. (Tr. 29). The Sixth Circuit has held that an ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*,

246 F.3d 762, 773 (6th Cir. 2001) (quoting *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992)). An ALJ does not err by giving a checkbox form little weight "where the physician provided no explanation for the restrictions entered on the form and cited no supporting objective medical evidence." *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016) (court found no error where the treating physician simply noted plaintiff's impairments in the "remarks" section of the checkbox physical capacity evaluation form) (citing *Rogers v. Comm'r of Soc. Sec.*, No. 99-5650, 2000 WL 799332 (6th Cir. June 9, 2000) ("treating physician's documentation of impairments on form with checked-off boxes was not entitled to great weight when no further explanation given"). In declining to afford Dr. Murthy's opinion controlling weight, the ALJ considered Dr. Murthy's opinion in accordance with the factors set forth in 20 C.F.R. § 416.927(c)(3)-(6). While the ALJ incorrectly wrote that Dr. Murthy was a psychologist rather than a psychiatrist, the ALJ recognized the length, nature, and the extent of his treatment relationship with plaintiff, which dated back to April 2015. The ALJ also considered the consistency of his opinion with the evidence of record as required by 20 C.F.R. § 416.927(c). *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (ALJ not required to conduct an exhaustive factor-by-factor analysis of the factors listed in § 404.1527(c)). Accordingly, the Court finds that the ALJ complied with the requisite two-step inquiry and gave "good reasons" for assigning Dr. Murthy's opinion "little weight."

The ALJ's decision to give "little weight" to the opinion of Mr. Box is also supported by

substantial evidence.[6] The ALJ appropriately considered the consistency of Mr. Box's opinion with his own treatment notes and the other record evidence. (Tr. 29). The ALJ noted that although Mr. Box had treated plaintiff since February 2015, his opinion concerning marked or extreme limitations in all categories of work-related functioning was inconsistent with his own treatment notes and plaintiff's GAF score of 60. (*Id.*). Similar to Dr. Murthy, Mr. Box opined that plaintiff had an extreme limitation, i.e., no useful ability, in performing daily activities, such as paying bills and maintaining a residence. (Tr. 923). As the ALJ noted, however, the record evidence showed plaintiff was able to manage her household and personal finances. (Tr. 29). Moreover, Mr. Box's opinion that plaintiff had "no useful ability" to pay bills (Tr. 923) directly contradicts his opinion that plaintiff "is capable of managing her finances." (*Id.*). Finally, Mr. Box assessed a GAF of 60, indicating moderate symptoms. (Tr. 870). As the ALJ reasonably found, Mr. Box offered no subsequent discussion of a significant worsening of plaintiff's condition to support the marked and extreme limitations he later assessed. (Tr. 29). (*See also* Tr. 810, 812, 813, 814, 818, 820, 821, 824-28, 830-31, 834-37, 841, 843-45, 847-49, 852-54 (all indicating "no significant change from last visit")).

Plaintiff also argues that the ALJ erred in crediting the opinions of the state agency psychologists, Drs. Richardson and Rudy, over the opinions of Dr. Murthy and Mr. Box. (Doc. 15 at 12). Plaintiff alleges that these psychologists rendered their opinions prior to the

---

[6] The ALJ mistakenly referred to Mr. Box as a "doctor" and "treating psychiatrist." (Tr. 29). The record, however, demonstrates that Mr. Box is a licensed counselor and, therefore, his opinion is not entitled to any special deference. "The opinion of a 'non-acceptable medical source' is not entitled to any particular weight or deference—the ALJ has discretion to assign it any weight he feels appropriate based on the evidence of record." *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 248-49 (6th Cir. 2015) (citing *Walters*, 127 F.3d at 530). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (ALJ has discretion to determine proper weight to accord opinions from "other sources").

submission of records by Dr. Murthy and Mr. Box. (*Id.*). When warranted, the opinions of

agency medical and psychological consultants "may be entitled to greater weight than the

opinions of treating or examining sources." *Gayheart*, 710 F.3d at 379-80 (citing SSR 96-6p,

1996 WL 374180, at *3). *See also Wisecup v. Astrue*, No. 3:10-cv-325, 2011 WL 3353870, at *7

(S.D. Ohio July 15, 2011) (Ovington, M.J.) (Report and Recommendation), *adopted*, 2011 WL

3360042 (S.D. Ohio Aug. 3, 2011) ("opinions of non-examining state agency medical

consultants have some value and can, under some circumstances, be given significant weight").

The opinions of reviewing sources "can be given weight only insofar as they are supported by

evidence in the case record." *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x at 997, 1002 (6th Cir.

2011) (citing SSR 96-6p, 1996 WL 374180, *2) (1996). However, "[t]here is no categorical

requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed

and comprehensive' case record" in order for the opinion of the non-treating source's opinion to

be entitled to greater weight than the opinion of a treating source." *Id*. at 1002. The Sixth

Circuit has explained:

> There will always be a gap between the time the agency experts review the record
> . . . and the time the hearing decision is issued. Absent a clear showing that the
> new evidence renders the prior opinion untenable, the mere fact that a gap exists
> does not warrant the expense and delay of a judicial remand.

*Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009). Before an ALJ accords

significant weight to the opinion of a non-examining source who has not reviewed the entire

record, the ALJ must give "'some indication' that he 'at least considered' that the source did not

review the entire record. . . . In other words, the record must give some indication that the ALJ

subjected such an opinion to scrutiny." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632

(6th Cir. 2016) (construing *Blakley*, 581 F.3d at 409).

When weighing the medical opinions of record, the ALJ recognized that Drs. Richardson and Rudy rendered their opinions in 2014, whereas Dr. Murthy and Mr. Box rendered their opinions in January 2017. (Tr. 29). The ALJ noted that the opinions of Drs. Richardson and Rudy were generally supported by the record. However, the ALJ implicitly acknowledged that the other record evidence showed plaintiff was further limited in her ability to deal with the public and should have no such interaction. (Doc. 29). As a result, the ALJ imposed greater restrictions on plaintiff's mental RFC and limited her to no interaction with the general public. Plaintiff has failed to show any error in this regard. Accordingly, plaintiff's first assignment of error should be overruled.

**2. Plaintiff has failed to establish any error with the ALJ's credibility finding.**

Plaintiff alleges in his second assignment of error that the ALJ failed to comply with SSR 96-7p and failed to articulate the weight given to plaintiff's subjective complaints. (Doc. 15 at 14). Plaintiff alleges that subjective complaints cannot be rejected solely on the basis of lack of objective medical evidence. (*Id.* at 14). Plaintiff asserts that her testimony documenting chronic pain issues and mental health issues is supported by her treating physicians and the objective findings that they made, as well as the opinions of examiners Drs. Stegman and Halmi. (*Id.* at 15-16).

In response, the Commissioner contends that the ALJ provided detailed reasons for why he did not accept plaintiff's allegations of disabling limitations, such as plaintiff's normal clinical examination findings, treatment history, use of medication and therapy, and daily activities. (Doc. 20 at 13-14).

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citations omitted). In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton*, 246 F.3d at 773. *See also Walters*, 127 F.3d at 531 ("[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."). Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Id.*

In addition, 20 C.F.R. § 416.929 and SSR 96-7p, 1996 WL 374186 (July 2, 1996)[7] describe a two-part process for assessing the credibility of an individual's statements about symptoms, including pain. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain

---

[7] Effective March 28, 2016, SSR 96-7p has been superseded by SSR 16-3p, 2016 WL 1119029, which "provides guidance about how [the SSA] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms." *See* 2016 WL 1237954 (clarifying effective date of SSR 16-3p). There is no indication in the text of SSR 16-3p that the SSA intended to apply SSR 16-3p retroactively, and the Ruling therefore does not apply here. *Accord Cameron v. Colvin*, No. 1:15-cv-169, 2016 WL 4094884, at *2 (E.D. Tenn. Aug. 2, 2016).

or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c); SSR 96-7p.

Plaintiff has not shown that the ALJ committed any error in connection with the assessment of her credibility. The Court finds that the ALJ adequately considered plaintiff's subjective statements as to her symptoms and functional limitations, along with her daily activities, the objective medical evidence, and the medical opinions of record. (Tr. 25-29). *See Newman v. Colvin*, No. 1:15-cv-639, 2017 WL 685685, at \*7 (S.D. Ohio Feb. 1, 2017) (holding that ALJ properly considered the requisite factors in making his credibility determination because he considered plaintiff's subjective statements, objective medical evidence, plaintiff's activities of daily living, and the record medical opinions), *report and recommendation adopted, Newman v. Comm'r of Soc. Sec.*, 2017 WL 680632 (S.D. Ohio Feb. 21, 2017); *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005) ("[t]he ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ followed the requisite two-step process and gave a thorough account of the evidence in assessing the credibility of plaintiff's allegations of pain and limitation. The ALJ determined that plaintiff had medically determinable physical and mental impairments that could reasonably be expected to cause her alleged symptoms. (Tr. 26). However, the ALJ found that plaintiff's statements as to the intensity, persistence and limiting effect of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. In making this determination, the ALJ thoroughly evaluated and relied on: (1) the lack of supporting

objective medical evidence; (2) plaintiff's daily activities; (3) plaintiff's treatment history; and (4) the medical opinions of record.

The record supports the ALJ's finding that the objective medical evidence was not fully consistent with plaintiff's allegations related to her symptoms. With regard to her physical impairments, the ALJ noted that while plaintiff alleged debilitating joint and spinal pain, the objective medical evidence showed normal clinical findings that were inconsistent with her allegations of debilitating pain. (Tr. 26) (citing Exhibit B4F—normal range of motion with no restrictions during Dr. Stegman's physical consultative examination; Exhibits B7F/23, B26F/3—November 2014 x-ray showed minimal cervical spondylosis; Exhibit B6F—clinical examination with Dr. Danko in November 2014 revealed normal range of motion with normal lordosis, no myofascial trigger points, minimal facet tenderness, and lumbar spine showed normal lordosis or tenderness, a normal range of motion, and negative straight leg raising; Exhibit B13F/25—March 2015 emergency room examination showed a normal range of motion in all extremities and normal coordination; Exhibit B30F/12—September 2015 x-ray of the spine revealed mild lumbar spondylosis at L3-4 and L4-5, with no disc herniations; Exhibit B26F/3—September 2015 MRI confirmed no central or foraminal stenosis and no herniations, and only mild spondylosis at L3-4 and L4-5; Exhibit B13F/6—March 2016 examination showed normal gait, 5/5 strength, and equal movement in all extremities; Exhibit B28F/2—mild edema in the right ankle with mild tenderness and imaging showing near/full consolidation of her ankle fracture; Exhibit B26F/3—November 2016 examination showed a normal range of motion in the bilateral shoulders and limited range of motion in the knees, hip, and lumbar spine). With regard to plaintiff's mental impairments, the ALJ reasonably discounted plaintiff's allegations of debilitating mental

28

limitations based on a number of missed psychotherapy appointments and plaintiff's reports of

attending demonstrations and parties, as well as searching for houses with her boyfriend. (Tr.

27). The ALJ also noted that the treatment records suggested no need for increasing plaintiff's

dosages of psychotropic medications; no required inpatient hospitalizations; and no instances of

decompensation indicating a deteriorating mental status. (Doc. 28). Contrary to plaintiff's

assertion, the ALJ did not reject her complaints of pain and mental limitations based on the lack

of supporting objective evidence alone.

   Plaintiff alleges that her subjective complaints of debilitating pain are consistent with the

consultative examination conducted by Dr. Stegman and more specifically, Dr. Stegman's

opinion that plaintiff "appears to have major limitations in her ability to perform physical duties

over an eight-hour day." (Doc. 15 at 14) (citing Tr. 436). Plaintiff also alleges that her

subjective complaints of debilitating mental limitations are consistent with the examination of

Dr. Halmi and the opinions of Dr. Murthy and Mr. Box. (*Id.* at 15). However, as explained

above in connection with plaintiff's first assignment of error, the ALJ properly discounted the

opinions of Dr. Murthy and Mr. Box. Even if the Court were to agree that the opinions of the

examiners Dr. Halmi and Dr. Stegman corroborated plaintiff's subjective complaints, the ALJ's

decision must be affirmed if it is supported by substantial evidence. *See Ulman v. Comm'r of

Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012); *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir.

1999). Though there is some medical evidence supporting plaintiff's testimony, the ALJ's

credibility determination is substantially supported by the reasons identified by the ALJ and

should not be disturbed by this Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.

1983).

The ALJ cited ample reasons for discounting plaintiff's credibility. Because the ALJ's

credibility determination is supported by substantial evidence, this Court must defer to it. *See*

*Buxton*, 246 F.3d at 772. Plaintiff's second assignment of error should be overruled.

### 3. The impact of plaintiff's obesity.

Plaintiff argues the ALJ erred by failing to consider the impact of her obesity on

her ability to work in accordance with SSR 02-01p. (Doc. 15 at 16-18). Plaintiff alleges that her

physical conditions are impacted by her obesity, such as her lumbar and cervical spine disorders

and degenerative joint disorder of the bilateral hips, knees, shoulders, and right ankle. (*Id.* at

17).[8]

SSR 02-01p addresses the evaluation of obesity in the disability process. Social Security

Ruling 02-01p, 2000 WL 628049 (Sept. 12, 2002). SSR 02-01p recognizes that obesity may

affect an individual's ability to perform the exertional functions of sitting, standing, walking,

lifting, carrying, pushing, and pulling, as well as an individual's ability to perform postural

functions such as climbing, balancing, stooping, and crouching. SSR 02-01p, 2000 WL 628049,

at *6. The Ruling insures that the Commissioner will consider a claimant's obesity in

performing steps two through five of the sequential analysis. SSR 02-01p, 2000 WL 628049, at

*3. SSR 02-01p does not mandate a particular mode of analysis for an obese claimant. *Bledsoe*

*v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). "It only states that obesity, in combination

with other impairments, 'may' increase the severity of the other limitations." *Id.* at 412 (quoting

SSR 02-01p). *See also Young v. Comm'r of Soc. Sec.*, No. 3:09 CV 1894, 2011 WL 2182869, at

---

[8] Plaintiff appears to allege that the ALJ did not find that her obesity was a severe impairment. (Doc. 15 at 17).
However, the ALJ did find that plaintiff's obesity was a severe impairment. (Tr. 22).

*7 (N.D. Ohio June 6, 2011) ("The Sixth Circuit requires the ALJ to mention obesity either expressly or indirectly where the record includes evidence of obesity's effects on the claimant's impairments.").

In light of the regulations requiring that a claimant "must furnish medical and other evidence that [the Commissioner] can use to reach conclusions about your medical impairment(s) and . . . its effect on your ability to work on a sustained basis," 20 C.F.R. § 416.912, a claimant relying on obesity to establish disability should provide evidence that obesity affects her ability to work. *Snyder v. Comm'r of Soc. Sec.*, No. 2:10-cv-00821, 2012 WL 27302, at *8 (S.D. Ohio Jan. 5, 2012) (Report and Recommendation), *adopted*, 2012 WL 871202 (S.D. Ohio Mar. 13, 2012) (citing *Cranfield v. Comm'r, Soc. Sec.*, 79 F. App'x 852, 857-58 (6th Cir. 2003) (finding that even though physician's reports indicated obesity, the ALJ was not obligated to address the claimant's obesity in light of the claimant's failure to provide evidence that her obesity was a significant impairment that affected her ability to work); *May v. Astrue*, No. 4:10-cv-1533, 2011 WL 3490186, at *6 (N.D. Ohio June 1, 2011) (holding that the ALJ had no obligation to address a claimant's obesity when, despite a diagnosis of obesity in the record, the claimant did not carry burden of demonstrating there were any "functional limitations ascribed to the condition[ ]")).

Here, the ALJ found that plaintiff's obesity was a severe impairment. (Tr. 22). The ALJ specifically noted that he "considered the [plaintiff]'s condition of obesity." (Tr. 23). The ALJ noted that "[b]ased on the objective evidence the functional limitations adopted herein generously consider the [plaintiff]'s weight and its effect on her ability to ambulate as well as her other body systems." (*Id.*). In formulating plaintiff's RFC, the ALJ considered that plaintiff was

31

5'7 and weighed 210 pounds. (Tr. 26). The ALJ also explained, "considering the combined musculoskeletal and pulmonary findings, compounded by obesity, the record supports the ability to perform light exertional activities with additional environmental and manipulative restrictions." (Tr. 27). In weighing the opinions of the state agency reviewing physicians, the ALJ concluded that "[c]onsidering the [plaintiff]'s combined pulmonary and musculoskeletal conditions, compounded by obesity, medium exertional ability is unrealistic." (Tr. 28). The ALJ's decision reflects that he thoroughly and explicitly considered plaintiff's obesity when assessing the RFC.

Plaintiff argues that her physical conditions are further impacted by her obesity. (Doc. 15 at 17). In support, plaintiff cites to May 2016 records from Advanced Spine and Pain Management that document the following clinical findings: shoulder range of motion abnormal bilateral, knee tenderness upon palpation, decreased range of motion in the knees, hip joint range of motion limited with crepitus, decreased range of motion of the lumbar spine, facet loading positive, and paravertebral muscular tension increased. (*Id.*) (citing Tr. 545-46). Plaintiff argues that "clearly everything noted above by the Plaintiff's medical treatment source is clearly impacted by the Plaintiff's obesity as contemplated in SSR 02-01p." (*Id.*). Plaintiff also cites to the medical source statement from Ms. Scholl, her treating physical therapist. (Doc. 23 at 12) (citing Tr. 899-903). However, it is not "clear" to the Court how plaintiff's obesity had an impact on these one-time clinical findings. Nor has plaintiff identified any functional limitations imposed by her obesity or an opinion from a medical source that plaintiff's abnormal clinical findings in May 2016 were a result of her obesity. The ALJ was not required to assume in the absence of such evidence that obesity exacerbated plaintiff's impairments and impacted her

ability to perform basic work activities. *See* SSR 02-01p, 2000 WL 628049, at *6 (the ALJ "will

not make assumptions about the severity or functional effects of obesity combined with other

impairments."). Accordingly, plaintiff's third assignment of error should be overruled.

### 4. The ALJ properly determined plaintiff's RFC and considered the opinion of plaintiff's physical therapist.[9]

Plaintiff argues that the ALJ failed to properly evaluate her RFC. (Doc. 15 at 18-20).

Specifically, plaintiff questions the ALJ's decision to afford "some weight" to the physical RFCs

of the state agency reviewing physicians, Drs. Wysokinski and Torello. (*Id.* at 19). Plaintiff

argues that these physicians "never personally examined [her] and submitted their respective

opinions prior to the medical record being complete." (*Id.*). Plaintiff also argues that the ALJ

erred in affording no weight to the medical source evaluation completed by her physical

therapist, Ms. Scholl. (*Id.* at 19-20). Plaintiff argues that the ALJ failed to comply with Social

Security Ruling 06-03p in considering Ms. Scholl's evaluation. (*Id.* at 21).

The ALJ should "*explain* the weight given to opinions from 'other sources,' [such as

physical therapists] or otherwise ensure that the discussion of the evidence in the determination

or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such

opinions may have an effect on the outcome of the case." SSR 06–03p, 2006 WL 2329939, at

*6 (emphasis added). Because a physical therapist is not considered an "acceptable medical

source" under the regulations, an ALJ is not required to give any special deference to

a physical therapist's report. *Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x 358, 363 (6th Cir.

2001) (physical therapist's report not afforded significant weight because therapist not

---

[9] The Court will consider plaintiff's fourth and fifth assignment of errors together.

33

recognized as an acceptable medical source); *Jamison v. Comm'r*, No. 1:07-cv-152, 2008 WL 2795740, at *10 (S.D. Ohio July 18, 2008) (Dlott, J.) (same). The ALJ has the discretion to determine the appropriate weight to accord the opinion of a medical source who is not an "acceptable medical source" based on all the evidence in the record. *Walters*, 127 F.3d at 530.

The ALJ's decision to discount Ms. Scholl's opinion is supported by substantial evidence. The ALJ correctly assessed that Ms. Scholl is not an acceptable medical source under the regulations and therefore her opinion was not entitled to any special deference. In addition, the ALJ noted that her opinion was inconsistent with the medical source statements assessing plaintiff's physical capacity, the generally normal clinical findings, and the imaging showing only mild musculoskeletal issues. (Tr. 28). Plaintiff argues that the ALJ failed to consider the frequency and length of Ms. Scholl's treatments with plaintiff. (Doc. 15 at 20). However, the ALJ noted that Ms. Scholl was plaintiff's treating physical therapist but her opinion was nevertheless inconsistent with normal clinical findings.

The ALJ's weighing of the medical opinions in assessing plaintiff's RFC, including those opinions of the state agency reviewing physicians, is also supported by substantial evidence. As explained above, the ALJ properly afforded "little weight" to the opinions of Dr. Murthy and Mr. Box, and properly considered the opinion of Ms. Scholl. Plaintiff disagrees with the ALJ's decision to afford "some weight" to the opinions of state agency reviewing physicians Drs. Wysokinski and Torello on the basis that they submitted their opinions prior to having a complete record. (Doc. 15 at 19). However, the ALJ considered that plaintiff's physical limitations were greater than these physicians assessed and noted that "medium exertional ability is unrealistic." (Tr. 28). The ALJ therefore limited plaintiff to an RFC of light work. Although

plaintiff disagrees with the ALJ's RFC assessment, plaintiff points to no additional evidence showing functional limitations imposed by her impairments that the ALJ failed to take into account when formulating the RFC. Accordingly, plaintiff's fourth and fifth assignments of error should be overruled.

**IT IS THEREFORE RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** and this case be closed on the docket of the Court.

Date: _2/11/19_

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

AMY M. JORDAN,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-120
Barrett, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn*, 474 U.S. 140 (1985); *United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981).